## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>Department of Justice )<br>Antitrust Division )<br>1401 H Street, NW )<br>Suite 3000 )<br>Washington, D.C.  20530 )<br>　　　　　　Plaintiff, )<br>　　　　　　　　　　　)<br>　　　　v. )<br>　　　　　　　　　　　)<br>COOKSON GROUP PLC )<br>165 Fleet Street )<br>London EC4A 2AE )<br>England, )<br>　　　　　　　　　　　)<br>COOKSON AMERICA INC. )<br>1 Cookson Place )<br>Providence, RI 02903-3248, )<br>　　　　　　　　　　　)<br>FOSECO PLC )<br>Coleshill Road )<br>Fazeley )<br>Tamworth )<br>Staffordshire B78 3TL )<br>England, )<br>　　　　　　　　　　　)<br>and )<br>　　　　　　　　　　　)<br>FOSECO METALLURGICAL INC. )<br>20200 Sheldon Road )<br>Cleveland, OH 44142 )<br>　　　　　　　　　　　)<br>　　　　　　Defendants. )<br>　　　　　　　　　　　) | Civil Action No.<br><br>JUDGE<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, brings this civil antitrust action to enjoin the proposed acquisition by Cookson

Group plc of Foseco plc and to obtain equitable and other relief. The United States complains and alleges as follows:

## I. NATURE OF THE ACTION

1.      On October 11, 2007, Cookson and Foseco announced that they had reached agreement on the terms of a recommended cash offer by Cookson for the entire issued and to-be-issued share capital of Foseco in a transaction valued at approximately $1 billion.

2.      Cookson and Foseco both manufacture and sell isostatically pressed carbon bonded ceramics products ("CBCs"), which are used to control the flow and enhance the quality of steel produced in the continuous casting steelmaking process. Cookson's proposed acquisition of Foseco would combine two of only three North American manufacturers of certain CBCs.

3.      The United States brings this action to enjoin Cookson's proposed acquisition of Foseco because it would substantially lessen competition in the markets for certain CBCs in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. PARTIES TO THE PROPOSED ACQUISITION

4.      Cookson Group plc ("Cookson"), a United Kingdom corporation with its headquarters in London, England, is a manufacturer and processor of ceramics, electronics, and precious metals. Cookson's total 2006 worldwide revenues were approximately $3.3 billion, and its total 2006 U.S. revenues were about $356 million. Cookson America Inc., a wholly-owned subsidiary of Cookson Group plc, is a Delaware corporation with its headquarters in Providence, Rhode Island. Cookson, through its subsidiaries, manufactures CBCs in the United States and Mexico and distributes them throughout the United States. In 2006, Cookson's U.S. CBC revenues were about $75 million.

2

5.      Foseco plc, a United Kingdom corporation with its headquarters in Staffordshire, England, manufactures refractories and related products for sale, and offers services worldwide to the steel and foundry industries.  Its total 2006 worldwide revenues were approximately $817 million, and its total 2006 U.S. revenues were about $110 million.  Foseco Metallurgical Inc., a wholly-owned subsidiary of Foseco plc, is a Delaware corporation with its headquarters in Cleveland, Ohio (together with Foseco plc, "Foseco").  Foseco manufactures CBCs in the United States and distributes them throughout the United States.  In 2006, Foseco's U.S. CBC revenues were about $4 million.

## III.  JURISDICTION AND VENUE

6.      The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7.      Defendants manufacture and sell CBCs in the flow of interstate commerce. Defendants' activities in manufacturing and selling these products substantially affect interstate commerce.  This Court has subject matter jurisdiction over this action pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.      Defendants have consented to venue and personal jurisdiction in this judicial district and venue is proper under 28 U.S.C. § 1391(d).

## IV.  TRADE AND COMMERCE

**A.     CBCs Generally**

9.      Refractories are non-metallic ceramics that serve as a heat buffer or lining in industrial devices because they withstand extremely high temperatures.  In the steelmaking process, refractory products serve as barriers between hot molten steel and the non-consumable equipment such as the furnaces, ladles, and tundishes.  A ladle is a large container that receives molten steel from a furnace; a tundish is a receptacle that receives steel from the ladle and controls the flow of steel into molds during the continuous casting process.

10.      CBCs are consumable, isostatically pressed refractory products that control the flow of molten steel from the ladle to the tundish and onto the continuous casting mold during the continuous casting process.  CBCs are consumed through exposure to molten steel and must be replaced frequently.

11.      Isostatic pressing is a process used in the manufacture of CBCs to increase the refractory materials' density and homogeneity, resulting in a CBC with increased thermal shock resistance and resistivity to chemical attack.  Carbon-bonded alumina graphite is the main refractory material used to make CBCs.

12.      The "design" of a CBC refers to both its shape and the alumina graphite recipe. Each customer uses different designs tailored to the equipment it uses in the casting process. Customers with multiple plants require custom-designed CBCs for each plant and may require multiple custom-designed CBCs within each plant.  Designs depend on variables such as the customer's cast strand size and shape, casting speed, and the steel grades produced.  Customers change CBC recipes and/or shapes in order to improve steel quality, meet new steel

4

specifications, or save on CBC costs.

13.    CBCs undergo rigorous testing by the manufacturer and the customer to ensure reliable performance and value under actual casting conditions.  Because CBCs are critical to the steelmaking process, most customers have a policy of splitting sales between at least two suppliers to ensure supply.

**B.    The Relevant Product Markets**

### 1.    Ladle Shrouds

14.    Ladle shrouds are CBCs that prevent molten steel from re-oxidizing and ensure the steel transfers safely from the ladle to the tundish.

15.    There are no good substitutes for ladle shrouds.  A small but significant post-acquisition increase in the price of ladle shrouds would not cause customers to substitute another product or otherwise reduce their usage of ladle shrouds in sufficient quantities so as to make such a price increase unprofitable.

16.    The manufacture and sale of ladle shrouds is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

### 2.    Stopper Rods

17.    Stopper rods are CBCs used to control the flow of steel out of the tundish and are one of two types of devices, the other being slide gate systems, that can perform this function. Customers use only one device or the other in a given tundish.  The choice of device depends on the design of the tundish.  Once the choice of tundish design has been made, a customer cannot switch from a stopper rod to a slide gate system without also replacing or substantially reconfiguring the tundish—significantly disrupting their operations.

18.     Because of high switching costs, a small but significant post-acquisition increase in the price of stopper rods would not cause customers to switch to slide gate systems or otherwise reduce their usage of stopper rods in sufficient quantities so as to make such a price increase unprofitable.

19.     The manufacture and sale of stopper rods is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

## C. The Relevant Geographic Markets

20.     Cookson and Foseco manufacture ladle shrouds and stopper rods at facilities in North America for sale in the United States.

21.     Virtually all ladle shrouds and stopper rods purchased by customers in the United States are produced in plants located in North America.  Although a few manufacturers outside of North America make ladle shrouds and stopper rods, firms with production facilities in North America have a significant advantage over these foreign manufacturers in delivered cost and/or in competing for customers that value shorter lead times in their supply chain.

22.     A small but significant post-acquisition increase in the price of ladle shrouds and stopper rods would not cause customers in North America to switch to purchases from manufacturers outside of North America in sufficient numbers so as to make such a price increase unprofitable.

23.     Accordingly, within the meaning of Section 7 of the Clayton Act, the relevant geographic market for ladle shrouds and stopper rods is North America.

**D.    Anticompetitive Effects: The Proposed Transaction Will Harm Competition in the Markets for Ladle Shrouds and Stopper Rods**

24.    The production of ladle shrouds and stopper rods involves similar materials and manufacturing processes. In general, manufacturers that are successful in selling ladle shrouds to U.S. customers are also successful in selling stopper rods to U.S. customers, and vice versa.

25.    Cookson and Foseco are two of only three firms that manufacture and sell the vast majority of ladle shrouds and stopper rods to U.S. customers. Cookson and Foseco have competed with one another on price, service, and innovation in the markets for stopper rods and ladle shrouds. The markets for ladle shrouds and stopper rods would become substantially more concentrated if Cookson acquires Foseco. Cookson and Foseco would have a combined share of approximately 75 percent. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI") (defined and explained in Appendix A), the proposed transaction would increase the HHI in both markets by approximately 700 points to a post-transaction level in excess of 6000.

26.    Customers request bids from ladle shroud and stopper rod suppliers and consider price, quality, service, and innovation in selecting the winning bidder. The proposed acquisition will eliminate Foseco as an independent bidder.

27.    This reduction in the number of active bidders from three to two will reduce competition and likely will result in higher prices and/or reductions in service and innovation for a significant number of customers in the markets for ladle shrouds and stopper rods. The likely anticompetitive effect is heightened due to customers' preferences to maintain supply relationships with two independent suppliers simultaneously. In light of such preferences, the

7

proposed acquisition will eliminate competition to be a customer's second supplier.

28.    Foreign manufacturers likely will not have the incentive or ability to defeat an anticompetitive increase in price or reduction in service or innovation because of their high delivered costs, customers' preferences for North American suppliers, and/or the poor quality and reputation of their products.

29.    The proposed acquisition will substantially lessen competition in the manufacture and sale of ladle shrouds and stopper rods in the United States in violation of Section 7 of the Clayton Act.

**E.    Entry:  New Entrants Will Not Defeat an Exercise of Market Power**

30.    Successful entry into the ladle shroud and stopper rod markets would not be timely, likely, or sufficient to deter the anticompetitive effects resulting from this transaction. Timely entry sufficient to replace the market impact of Foseco would be difficult for several reasons.  A new entrant would need to acquire manufacturing facilities in North America and capital equipment; assemble or develop manufacturing, technical expertise, and personnel; conduct extensive customer trials; and establish a reputation for quality and reliability among U.S. customers.  An entrant undertaking these steps would be unable to enter in less than two years.

31.    There are foreign firms with a share of the U.S. market for more complex CBCs, known as subentry nozzles and subentry shrouds.  Because of the expertise and reputation they have developed in these markets, theoretically they would be capable of entering the domestic market for ladle shrouds and stopper rods.   None of these firms, however,  are likely to open U.S. manufacturing facilities within the next several years.

## V. **VIOLATION ALLEGED**

32.    The proposed acquisition of Foseco by Cookson would substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

33.    Unless restrained, the acquisition will have the following anticompetitive effects, among others:

a.    competition in the markets for the manufacture and sale of ladle shroud and stopper rods in the United States will be lessened substantially;

b.    actual and potential competition between Cookson and Foseco in the manufacture and sale of ladle shrouds and stopper rods in the United States will be eliminated; and

c.    prices for ladle shrouds and stopper rods in the United States likely will increase, and/or service and innovation likely will decline.

## VI. **REQUEST FOR RELIEF**

34.    Plaintiff requests that:

a.    Cookson's proposed acquisition of Foseco be adjudged and decreed to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.    defendants and all persons acting on their behalf be permanently enjoined and restrained from consummating the proposed acquisition or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Cookson with the operations of Foseco;

9

c.   plaintiff be awarded its costs for this action; and

d.   plaintiff receive such other and further relief as the Court deems just and

proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
Thomas O. Barnett
Assistant Attorney General
D.C. Bar #426840

_____
Maribeth Petrizzi
Chief, Litigation II Section
D.C. Bar #435204

_____
David L. Meyer
Deputy Assistant Attorney General
D.C. Bar #414420

_____
Dorothy B. Fountain
Assistant Chief, Litigation II Section
D.C. Bar #439469

_____
J. Robert Kramer II
Director of Operations and
        Civil Enforcement

_____
Leslie Peritz
Helena Gardner
Attorneys
United States Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, NW, Suite 3000
Washington, D.C.  20530
(202) 307-0924

Dated:  March 4, 2008

## APPENDIX A

## DEFINITION OF "HHI"

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size and distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise significant antitrust concerns under the Department of Justice and Federal Trade Commission 1992 Horizontal Merger Guidelines.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

United States of America

## DEFENDANTS

Cookson Group plc and Foseco plc

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    London, England
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Leslie D. Peritz
U.S. Department of Justice, Antitrust Division
1401 H Street, N.W., Suite 3000
Washington, DC 20530
(202) 307-0924

ATTORNEYS (IF KNOWN)

Thomas A. McGrath. Esquire
Linklaters LLP
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9140

Anthony Swisher, Esquire
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC  20036
(202) 887-4263

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

◉ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

# IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

◉ **A. Antitrust**

[X] 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**        OR        ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Acquisition of Foseco plc by Cookson Group would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** [_____]  Check YES only if demanded in complaint
**JURY DEMAND:**    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☐    If yes, please complete related case form.

DATE *March 4, 2008*    SIGNATURE OF ATTORNEY OF RECORD *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO.: |
| | JUDGE: |
| v. | DECK TYPE: Antitrust |
| COOKSON GROUP PLC, | DATE STAMP: |
| COOKSON AMERICA INC., | |
| FOSECO PLC, and | |
| FOSECO METALLURGICAL INC., | |
| Defendants. | |

### CERTIFICATE OF SERVICE

I, Leslie D. Peritz, hereby certify that on March 4, 2008, I caused a copy of the foregoing Complaint, Hold Separate Stipulation and Order, and proposed Final Judgment to be served upon defendants COOKSON GROUP PLC and COOKSON AMERICA INC. and FOSECO PLC AND FOSECO METALLURGICAL INC., by mailing the document electronically to the duly authorized legal representatives of defendants as follows:

Counsel for COOKSON GROUP PLC
and COOKSON AMERICA INC.:

Thomas A. McGrath, Esquire
Linklaters LLP
1345 Avenue of the Americas
New York, New York 10105
(212)903-9140

Counsel for FOSECO PLC
and FOSECO METALLURGICAL INC.:

Anthony Swisher, Esquire
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
(202 887-4263

Leslie D. Peritz
PA Bar No. 87539
Attorney
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 3000
Washington, D.C. 20530
(202) 307-0924

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO.: |
| v. | JUDGE: |
| COOKSON GROUP PLC, | DECK TYPE:  Antitrust |
| COOKSON AMERICA INC., | DATE STAMP: |
| FOSECO PLC, and | |
| FOSECO METALLURGICAL INC., | |
| Defendants. | |

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

## I. DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.    "Acquirer" means the entity to whom defendants divest the Divestiture Business.

B.    "Cookson" means defendant Cookson Group plc, a United Kingdom corporation with its headquarters in London, England, and Cookson America Inc., a Delaware corporation with its headquarters in Providence, Rhode Island and includes its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "Foseco" means defendant Foseco plc, a United Kingdom corporation with its headquarters in Tamworth, Staffordshire, England, and Foseco Metallurgical Inc., a Delaware

corporation with its headquarters in Cleveland, Ohio and includes its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D.    "CBCs" means consumable, isostatically pressed refractory products made of carbon-bonded alumina graphite that control the flow of molten steel from the steel ladle to the continuous casting mold during the continuous casting of steel.

E.    "Divestiture Business" means Foseco's entire business engaged in the development, design, production, servicing, distribution, and sale of CBCs in the United States, including:

1.    Foseco's Saybrook, Ohio facility, and the related leasehold;

2.    all tangible assets used in the development, design, production, servicing, distribution, and sale of CBCs in the United States, including but not limited to all research data and activities and development activities; all manufacturing equipment, including but not limited to batch mix equipment, presses, drying and oven/kilning, finishing, packaging, and tooling; all fixed assets, real property (leased or owned), personal property, inventory, office furniture, materials, supplies, on- or off-site warehouses or storage facilities relating to the factory and property, and all other tangible property; all licenses, permits and authorizations issued by any governmental organization; all contracts, teaming arrangements, agreements, leases (including renewal rights), commitments, certifications, and understandings, including supply agreements; all customer lists, contracts, accounts, and credit records or similar records of all sales and potential sales; all

2

sales support and promotional materials, advertising materials, and production, sales and marketing files; all repair and performance records; all other records; and, at the option of the Acquirer, Foseco's U.S. water-modeling assets;

3.      all intangible assets used in the development, design, production, servicing, distribution, and sale of CBCs in the United States, including, but not limited to, all patents, all pending patent applications, licenses and sublicenses, intellectual property, copyrights, trademarks (registered and unregistered), trade names, service marks, and service names relating to the Divestiture Business, but excluding the corporate-level name and device and trademark of Foseco; all technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development; quality assurance and control procedures, design tools, and simulation capability; all manuals and technical information provided to employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Divestiture Business, including, but not limited to, designs of CBCs, and the results of successful and unsuccessful designs and trials; and

4.      notwithstanding anything to the contrary in the Final Judgment, if requested by an Acquirer, and subject to the approval of the United States in its sole discretion, defendants shall offer to enter into a transition services agreement

3

for a limited period with respect to certain support services (e.g., HR, IT, and/or health and safety).

## II. **OBJECTIVES**

The proposed Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Divestiture Business for the purpose of maintaining competition in the manufacture and sale of CBCs in the United States in order to remedy the effects that the United States alleges would otherwise result from Cookson's acquisition of Foseco. This Hold Separate Stipulation and Order ensures that, prior to such divestiture, the Divestiture Business remains an independent, economically viable, and ongoing business concern that will remain independent and uninfluenced by Cookson's acquisition of Foseco, and that competition is maintained during the pendency of the ordered divestiture.

## III. **JURISDICTION AND VENUE**

This Court has jurisdiction over the subject matter of this action and defendants do not object either to the Court's exercise of personal jurisdiction in this case or to the propriety of venue of this action in the United States District Court for the District of Columbia.

## IV. **COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT**

A.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at

4

any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B.     Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Hold Separate Stipulation and Order by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an Order of the Court.

C.     Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

D.     This Hold Separate Stipulation and Order shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.     In the event:  (1) the United States has withdrawn its consent, as provided in Paragraph IV(A) above; or (2) the proposed Final Judgment is not entered pursuant to this Hold Separate Stipulation and Order, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Hold Separate Stipulation and Order, and the making of this Hold Separate Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

F.      Defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made and that defendants later will raise no claim of mistake, hardship, or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. <u>HOLD SEPARATE PROVISIONS</u>

Until the divestiture required by the Final Judgment has been accomplished:

A.      Defendants shall preserve, maintain, and continue to operate the Divestiture Business as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct, and apart from those of defendants' other operations.  Defendants shall not coordinate their production, marketing, or terms of sale of any products with those produced by or sold under the Divestiture Business.  Within twenty (20) days after the entry of this Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

B.      Defendants shall take all steps necessary to ensure that:  (1) the Divestiture Business will be maintained and operated as an independent, ongoing, economically viable, and active competitor in the CBC business; (2) management of the Divestiture Business will not be influenced by defendants; and (3) the books, records, competitively sensitive sales, marketing, and pricing information, and decision-making concerning the production, distribution, and sale of products produced by or sold under the Divestiture Business will be kept separate and apart from defendants' other operations.

6

C.    Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the products produced by or sold under the Divestiture Business, and shall maintain at 2008 or previously approved levels for 2009, whichever are higher, all promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Divestiture Business.

D.    Defendants shall provide sufficient working capital and lines and sources of credit to continue to maintain the Divestiture Business as an economically viable and competitive, ongoing business, consistent with the requirements of Paragraphs V(A) and (B).

E.    Defendants shall take all steps necessary to ensure that the Divestiture Business is fully maintained in operable condition at no less than current capacity and sales and shall maintain and adhere to normal repair and maintenance schedules for the Divestiture Business.

F.    Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any asset or assets of the Divestiture Business.

G.    Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of the Divestiture Business.

H.    Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Business.

I.    Defendants' employees with primary responsibility for the production, operation, and sale of CBCs for the Divestiture Business, shall not be transferred or reassigned to other

areas within the company except for transfer bids initiated by employees pursuant to defendants' regular, established job posting policy. Defendants shall provide the United States with ten (10) calendar days notice of such transfer.

J.     Defendants shall appoint a person or persons, subject to the approval of the United States in its sole discretion, to oversee the Divestiture Business, and who will be responsible for defendants' compliance with this Section. This person shall have complete managerial responsibility for the Divestiture Business, subject to the provisions of the proposed Final Judgment. In the event such person is unable to perform his duties, defendants shall appoint, subject to the approval of the United States in its sole discretion, a replacement within ten (10) working days. Should defendants fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

K.     Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestiture pursuant to the Final Judgment to an Acquirer acceptable to the United States.

L.     This Hold Separate Stipulation and Order shall remain in effect until: (1) the consummation of the divestiture required by the proposed Final Judgment; (2) further order of the Court; or (3) the United States' voluntary dismissal of the Complaint in this matter.

Dated: 3/4          , 2008

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


Leslie Peritz, Esquire
United States Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, NW, Suite 3000
Washington, D.C.  20530
(202) 307-0924

FOR DEFENDANTS
COOKSON GROUP PLC and
COOKSON AMERICA INC.:


Thomas A. McGrath, Esquire
Linklaters LLP
1345 Avenue of the Americas
New York, New York  10105
(212) 903-9140


FOR DEFENDANT
FOSECO PLC and
FOSECO METALLURGICAL INC.:


Anthony Swisher, Esquire
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC  20036
(202) 887-4263


ORDER

IT IS SO ORDERED by the Court, this _____ day of _____, 2008.



_____
United States District Judge


9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: |
| Plaintiff, | |
| v. | JUDGE: |
| COOKSON GROUP PLC, | DECK TYPE: Antitrust |
| COOKSON AMERICA INC., | |
| FOSECO PLC, and | |
| FOSECO METALLURGICAL INC., | DATE STAMP: |
| Defendants. | |

## FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on 3/4/2008, the United States and defendants, Cookson Group plc and Cookson America Inc. and Foseco plc and Foseco Metallurgical Inc., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make a certain divestiture for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestiture required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. **Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. **Definitions**

As used in this Final Judgment:

A.    "Cookson" means defendant Cookson Group plc, a United Kingdom corporation with its headquarters in London, England, and Cookson America Inc., a Delaware Corporation with its headquarters in Providence, Rhode Island and includes its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "Foseco" means defendant Foseco plc, a United Kingdom corporation with its headquarters in Tamworth, Staffordshire, England, and Foseco Metallurgical Inc., a Delaware corporation with its headquarters in Cleveland, Ohio and includes its successors and assigns, and

2

its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "CBCs" means consumable, isostatically pressed refractory products made of carbon-bonded alumina graphite that control the flow of molten steel from the steel ladle to the continuous casting mold during the continuous casting of steel.

D.    "Divestiture Business" means Foseco's entire business engaged in the development, design, production, servicing, distribution, and sale of CBCs in the United States, including:

1.    Foseco's Saybrook, Ohio facility, and the related leasehold;

2.    all tangible assets used in the development, design, production, servicing, distribution, and sale of CBCs in the United States, including but not limited to all research data and activities and development activities; all manufacturing equipment, including but not limited to batch mix equipment, presses, drying and oven/kilning, finishing, packaging, and tooling; all fixed assets, real property (leased or owned), personal property, inventory, office furniture, materials, supplies, on- or off-site warehouses or storage facilities relating to the factory and property, and all other tangible property; all licenses, permits and authorizations issued by any governmental organization; all contracts, teaming arrangements, agreements, leases (including renewal rights), commitments, certifications, and understandings, including supply agreements; all customer lists, contracts, accounts, and credit records or similar records of all sales and potential sales; all sales support and promotional materials, advertising materials, and production,

3

sales and marketing files; all repair and performance records; all other records; and, at the option of the Acquirer, Foseco's U.S. water-modeling assets;

3.      all intangible assets used in the development, design, production, servicing, distribution, and sale of CBCs in the United States, including, but not limited to, all patents, all pending patent applications, licenses and sublicenses, intellectual property, copyrights, trademarks (registered and unregistered), trade names, service marks, and service names relating to the Divestiture Business, but excluding the corporate-level name and device and trademark of Foseco; all technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development; quality assurance and control procedures, design tools, and simulation capability; all manuals and technical information provided to employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Divestiture Business, including, but not limited to, designs of CBCs, and the results of successful and unsuccessful designs and trials; and

4.      notwithstanding anything to the contrary in this Final Judgment, if requested by an Acquirer, and subject to the approval of the United States in its sole discretion, defendants shall offer to enter into a transition services agreement

4

for a limited period with respect to certain support services (e.g., HR, IT, and/or health and safety).

E.    "Bonnybridge Business" means Foseco's European CBC business and its facilities in Bonnybridge, Stirlingshire, Scotland, which the European Commission has required to be divested along with the Divestiture Business.

F.    "Acquirer" means the entity to which defendants divest the Divestiture Business.

## III. **Applicability**

A.    This Final Judgment applies to Cookson and Foseco, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.    If, prior to complying with Section IV and V of this Final Judgment, defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Business, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the Acquirer of the assets divested pursuant to this Final Judgment.

## IV. **Divestiture**

A.    Defendants are ordered and directed, within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Business in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion after consultation with the European Commission. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed 60 calendar

5

days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Divestiture Business as expeditiously as possible.

B.    In accomplishing the divestiture ordered by this Final Judgment, defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Business. Defendants shall inform any person making inquiry regarding a possible purchase of the Divestiture Business that it is being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Business customarily provided in a due diligence process except such information or documents subject to the attorney-client privileges or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.    Defendants shall provide the Acquirer and the United States information relating to the personnel involved in the production, operation, research and development, design, and sale of CBCs to enable the Acquirer to make offers of employment. Defendants shall not interfere with any negotiations by the Acquirer to employ or contract with any defendant employee responsible for any such activity related to the Divestiture Business.

D.    Defendants shall permit prospective Acquirers of the Divestiture Business to have reasonable access to personnel responsible for the Divestiture Business; to make inspections of the physical facilities of the Divestiture Business; to have access to any and all environmental, zoning, and other permit documents and information; and to have access to any and all financial,

6

operational, or other documents and information customarily provided as part of a due diligence process.

     E.     Defendants shall warrant to the Acquirer that the Divestiture Business will be operational on the date of sale.

     F.     Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Business.

     G.     Defendants shall warrant to the Acquirer that there are no material defects in the environmental, zoning or other permits pertaining to the operation of the Divestiture Business, and that following the sale of the Divestiture Business, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Business.

     H.     Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Business, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Business can and will be used by the Acquirer as part of a viable, ongoing business for the manufacture and sale of CBCs in the United States. The divestiture, whether pursuant to Section IV or Section V of this Final Judgment,

          1.     shall be made to the acquirer of the Bonnybridge Business;

          2.     shall be made to an Acquirer that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the manufacture and sale of CBCs in the United States; and

3.    shall be accomplished so as to satisfy the United States, in its

sole discretion, that none of the terms of any agreement between an

Acquirer and defendants give defendants the ability unreasonably to

raise the Acquirer's costs, to lower the Acquirer's efficiency, or

otherwise to interfere in the ability of the Acquirer to compete

effectively in the manufacture and sale of CBCs in the United States.

### V. **Appointment of Trustee**

A.    If defendants have not divested the Divestiture Business within the time

period specified in Section IV(A), defendants shall notify the United States of that fact

in writing. Upon application of the United States, the Court shall appoint a trustee

selected by the United States, in consultation with the European Commission to ensure

selection of a trustee acceptable to both the United States and the European

Commission, and approved by the Court to effect the divestiture of the Divestiture

Business.

B.    After the appointment of a trustee becomes effective, only the trustee

shall have the right to sell the Divestiture Business. The trustee shall have the power

and authority to accomplish the divestiture to an Acquirer acceptable to the United

States at such price and on such terms as are then obtainable upon reasonable effort by

the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment,

and shall have such other powers as this Court deems appropriate. Subject to Section

V(D) of this Final Judgment, the trustee may hire at the cost and expense of defendants

8

any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

C.     Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance or that the Acquirer has not been approved by the European Commission.  Any objection by defendants on the ground of trustee malfeasance must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI; any objection by defendants based on lack of approval from the European Commission must be conveyed in writing to the United States and the trustee within the later of (i) five (5) days after the United States provides defendants with written notice, pursuant to Section VI(C), stating that it does not object to the proposed divestiture of the Divestiture Business or (ii) two (2) business days after the European Commission notifies defendants that it does not approve of the proposed Acquirer.

D.     The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred.  After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated.  The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Business and based on a fee

9

arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture.  The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information.  Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.    After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment.  To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Business, and shall describe in detail each contact with any such person.  The trustee shall maintain full records of all efforts made to divest the Divestiture Business.

10

G.      If the trustee has not accomplished the divestiture ordered under this

Final Judgment within six months after its appointment, the trustee shall promptly file

with the Court a report setting forth (1) the trustee's efforts to accomplish the required

divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has

not been accomplished, and (3) the trustee's recommendations. To the extent such

reports contain information that the trustee deems confidential, such reports shall not be

filed in the public docket of the Court. The trustee shall at the same time furnish such

report to the United States which shall have the right to make additional

recommendations consistent with the purpose of the trust. The Court thereafter shall

enter such orders as it shall deem appropriate to carry out the purpose of the Final

Judgment, which may, if necessary, include extending the trust and the term of the

trustee's appointment by a period requested by the United States.

## VI. **Notice of Proposed Divestiture**

A.      Within two (2) business days following execution of a definitive

divestiture agreement, defendants or the trustee, whichever is then responsible for

effecting the divestiture required herein, shall notify the United States of any proposed

divestiture required by Section IV or V of this Final Judgment. If the trustee is

responsible, it shall similarly notify defendants. The notice shall set forth the details of

the proposed divestiture and list the name, address, and telephone number of each

person not previously identified who offered or expressed an interest in or desire to

acquire any ownership interest in the Divestiture Business, together with full details of

the same.

11

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Acquirer(s), any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. **Financing**

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

12

## VIII. **Hold Separate**

Until the divestiture required by this Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. **Affidavits**

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Business, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Business, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitations on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

13

B.      Within twenty (20) calendar days of the filing of the Complaint in this

matter, defendants shall deliver to the United States an affidavit that describes in

reasonable detail all actions defendants have taken and all steps defendants have

implemented on an ongoing basis to comply with Section VIII of this Final Judgment.

Defendants shall deliver to the United States an affidavit describing any changes to the

efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section

within fifteen (15) calendar days after the change is implemented.

C.      Defendants shall keep all records of all efforts made to preserve and

divest the Divestiture Business until one year after such divestiture has been completed.

## X. Compliance Inspection

A.      For the purposes of determining or securing compliance with this Final

Judgment, or of determining whether the Final Judgment should be modified or

vacated, and subject to any legally recognized privilege, from time to time authorized

representatives of the United States Department of Justice, including consultants and

other persons retained by the United States, shall, upon written request of an authorized

representative of the Assistant Attorney General in charge of the Antitrust Division, and

on reasonable notice to defendants, be permitted:

          1.      access during defendants' office hours to inspect and copy, or at

          the option of the United States, to require defendants to provide hard

          copy or electronic copies of, all books, ledgers, accounts, records, data,

          and documents in the possession, custody, or control of defendants,

          relating to any matters contained in this Final Judgment; and

14

2.    to interview, either informally or on the record, defendants'

officers, employees, or agents, who may have their individual counsel

present, regarding such matters.  The interviews shall be subject to the

reasonable convenience of the interviewee and without restraint or

interference by defendants.

B.    Upon the written request of an authorized representative of the Assistant

Attorney General in charge of the Antitrust Division, defendants shall submit written

reports or responses to written interrogatories, under oath if requested, relating to any of

the matters contained in this Final Judgment as may be requested.

C.    No information or documents obtained by the means provided in this

section shall be divulged by the United States to any person other than an authorized

representative of the executive branch of the United States, except in the course of legal

proceedings to which the United States is a party (including grand jury proceedings), or

for the purpose of securing compliance with this Final Judgment, or as otherwise

required by law.

D.    If at the time information or documents are furnished by defendants to

the United States, defendants represent and identify in writing the material in any such

information or documents to which a claim of protection may be asserted under Rule

26(c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent

page of such material, "Subject to claim of protection under Rule 26(c)(7) of the

Federal Rules of Civil Procedure," then the United States shall give defendants ten (10)

calendar days notice prior to divulging such material in any legal proceeding (other than

15

a grand jury proceeding).

## XI.  No Reacquisition

Defendants may not reacquire any part of the Divestiture Business during the
term of this Final Judgment.

## XII.  Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to
apply to this Court at any time for further orders and directions as may be necessary or
appropriate to carry out or construe this Final Judgment, to modify any of its provisions,
to enforce compliance, and to punish violations of its provisions.

## XIII.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years
from the date of its entry.

## XIV.  Public Interest Determination

Entry of this Final Judgment is in the public interest.  The parties have complied
with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16,
including making copies available to the public of this Final Judgment, the Competitive
Impact Statement, and any comments thereon and the United States's responses to
comments.  Based upon the record before the Court, which includes the Competitive
Impact Statement and any comments and response to comments filed with the Court,
entry of this Final Judgment is in the public interest.

Date: _____


                              Court approval subject to procedures
                              of Antitrust Procedures and Penalties
                              Act, 15 U.S.C. § 16


                              _____

                              United States District Judge

17