## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>COOKSON GROUP PLC,<br>COOKSON AMERICA INC.,<br>FOSECO PLC, and<br>FOSECO METALLURGICAL INC.,<br><br>          Defendants. | CASE NO.:<br><br>JUDGE:<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

Defendant Cookson Group plc and Defendant Foseco plc have entered into an agreement

whereby Cookson will acquire Foseco.  The United States filed a civil antitrust Complaint on

March  , 2008 seeking to enjoin the proposed acquisition.  The Complaint alleges that the likely

effect of this acquisition would be to lessen competition substantially in the markets for certain

isostatically pressed carbon bonded ceramics products ("CBCs"), in violation of Section 7 of the

Clayton Act, 15 U.S.C. § 18.  This loss of competition likely would result in increased prices

and/or a reduction in service and innovation in the manufacture and sale of such CBCs in the

United States.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, defendants are required to divest Foseco's business engaged in the development, design, production, servicing, distribution, and sale of CBCs in the United States, including the CBC plant in Saybrook, Ohio and related assets (hereafter the "Divestiture Business"). Under the terms of the Hold Separate, defendants will take certain steps to ensure that the Divestiture Business is operated as a competitively independent, economically viable, and ongoing business concern; that it will remain independent and uninfluenced by the consummation of the acquisition; and that competition in the market for CBCs is maintained during the pendency of the ordered divestiture.

The United States and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    The Defendants and the Proposed Transaction

Cookson, a United Kingdom corporation with its headquarters in London, England, is a manufacturer and processor of ceramics, electronics, and precious metals. Cookson, through its subsidiary, Cookson America Inc., manufactures CBCs in the United States and Mexico and sells them throughout the United States. In 2006, Cookson's U.S. CBC revenues were about $75 million.

2

Foseco, a United Kingdom corporation with its headquarters in Staffordshire, England, manufactures refractories and related products for sale and offers services worldwide to the steel and foundry industries. Foseco, through its subsidiary, Foseco Metallurgical Inc., manufactures CBCs in the United States and sells them throughout the United States. In 2006, Foseco's U.S. CBC revenues were about $4 million.

On October 11, 2007, Cookson and Foseco announced that they had reached an agreement on the terms of a recommended cash offer by Cookson for the entire issued and to-be-issued share capital of Foseco in a transaction valued at approximately $1 billion.

**B.    The Competitive Effects of the Transaction**

1.    CBCs Generally

Refractories are non-metallic ceramics that serve as a heat buffer or lining in industrial devices because they withstand extremely high temperatures. In the steelmaking process, refractory products serve as barriers between hot molten steel and the non-consumable equipment such as the furnaces, ladles (large containers that receive molten steel from a furnace), and tundishes (receptacles that receive steel from the ladle).

CBCs are consumable, isostatically pressed refractory products that control the flow of molten steel from the ladle to the tundish and onto the continuous casting mold during the continuous casting process. Isostatic pressing is a process used in the manufacture of CBCs to increase the refractory materials' density and homogeneity, resulting in a CBC with increased thermal shock resistance and resistivity to chemical attack. Carbon-bonded alumina graphite is the main refractory material used to make CBCs. CBCs are consumed through exposure to molten steel and must be replaced frequently.

3

The "design" of a CBC refers to both its shape and the alumina graphite recipe. Each customer uses different designs tailored to the equipment it uses in the casting process. Customers with multiple plants require custom-designed CBCs for each plant and may require multiple custom-designed CBCs within each plant. Designs depend on variables such as the customer's cast strand size and shape, casting speed, and the steel grades produced. Customers change CBC recipes and/or shapes in order to improve steel quality, meet new steel specifications, or save on CBC costs.

CBCs undergo rigorous testing by the manufacturer and the customer to ensure reliable performance and value under actual casting conditions. Because CBCs are critical to the steelmaking process, most customers have a policy of splitting sales between at least two suppliers to ensure supply.

  2. <u>Relevant Product Markets</u>

*Ladle Shrouds*

The Complaint alleges that the manufacture and sale of ladle shrouds is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act. Ladle shrouds are CBCs that prevent molten steel from re-oxidizing and ensure the steel transfers safely from the ladle to the tundish.

There are no good substitutes for ladle shrouds. The Complaint alleges that a small but significant post-acquisition increase in the price of ladle shrouds would not cause customers to substitute another product or otherwise reduce their usage of ladle shrouds in sufficient quantities so as to make such a price increase unprofitable. Accordingly, the manufacture and sale of ladle shrouds is a relevant product market.

4

*Stopper Rods*

The Complaint alleges that the manufacture and sale of stopper rods is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act. Stopper rods are CBCs used to control the flow of steel out of the tundish and are one of two types of devices, the other being slide gate systems, that can perform this function. The choice of device depends on the design of the tundish. Once the choice of tundish design has been made, a customer cannot switch from a stopper rod to a slide gate system without also replacing or substantially reconfiguring the tundish—significantly disrupting their operations.

The Complaint alleges that, because of high switching costs, a small but significant post-acquisition increase in the price of stopper rods would not cause customers to switch to slide gate systems or otherwise reduce their usage of stopper rods in sufficient quantities so as to make such a price increase unprofitable. Accordingly, the manufacture and sales of stopper rods is a relevant product market.

### 3.  Relevant Geographic Market

Cookson and Foseco manufacture ladle shrouds and stopper rods at facilities in North America for sale in the United States. The Complaint alleges that virtually all ladle shrouds and stopper rods purchased by customers in the United States are produced in plants located in North America. Although a few manufacturers outside of North America make ladle shrouds and stopper rods, firms with production facilities in North America have a significant advantage over these foreign manufacturers in delivered cost and/or in competing for customers that value shorter lead times in their supply chain.

The Complaint alleges that a small but significant post-acquisition increase in the price of ladle shrouds and stopper rods would not cause customers in North America to switch to

5

purchases from manufacturers outside of North America in sufficient numbers so as to make such a price increase unprofitable. Accordingly, the relevant geographic market for ladle shrouds and stopper rods is North America.

> 4. Anticompetitive Effects

Cookson and Foseco are two of only three firms that manufacture and sell the vast majority of ladle shrouds and stopper rods to U.S. customers. Cookson and Foseco have competed with one another on price, service, and innovation in the markets for stopper rods and ladle shrouds. The markets for ladle shrouds and stopper rods would become substantially more concentrated if Cookson acquires Foseco. For example, Cookson and Foseco would have a combined share of approximately 75 percent. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI") (defined and explained in Appendix A), the proposed transaction will increase the HHI in both markets by approximately 700 points to a post-transaction level in excess of 6000.

Customers request bids from ladle shroud and stopper rod suppliers and consider price, quality, service, and innovation when selecting the winning bidder. The proposed acquisition will eliminate Foseco as an independent bidder. This reduction in the number of active bidders from three to two will reduce competition and likely will result in higher prices and/or reductions in service and innovation for a significant number of customers in the markets for ladle shrouds and stopper rods. The likely anticompetitive effects are heightened due to customers' preferences to maintain supply relationships with two independent suppliers simultaneously. In light of such preferences, the proposed acquisition will eliminate competition to be a customer's second supplier.

Moreover, manufacturers outside of North America likely will not have the incentive or

6

ability to defeat an anticompetitive increase in price or reduction in service or innovation because of their high delivered costs, customers' preferences for North American suppliers, and/or the poor quality and reputation of their products.

Further, successful entry into the ladle shroud and stopper rod markets would not be timely, likely, or sufficient to deter the anticompetitive effects resulting from this transaction. Timely entry sufficient to replace the market impact of Foseco would be difficult for several reasons. A new entrant would need to acquire capital equipment and manufacturing facilities in North America; assemble or develop manufacturing, technical, and personnel expertise; conduct extensive customer trials; and establish a reputation for quality and reliability among U.S. customers. An entrant undertaking these steps would need to undertake these steps would be unable to enter in less than two years.

There are foreign firms with a share of the U.S. market for more complex CBCs. Because of the expertise and reputation they have developed in these markets, theoretically they are capable of entering the domestic market for ladle shrouds and stopper rods. None of these firms, however, is likely to open North American manufacturing facilities within the next several years.

As a result of these barriers to entry into the North American market for ladle shrouds and stopper rods, entry by any other firm into the manufacture and sale of ladle shrouds and stopper rods will not be timely, likely, or sufficient to deter the anticompetitive effects resulting from this transaction.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestiture requirement of the proposed Final Judgment will eliminate the

7

anticompetitive effects of the acquisition in the markets for ladle shrouds and stopper rods by establishing a new, independent, and economically viable competitor. The proposed Final Judgment requires defendants, within 90 days after the filing of the Complaint, or five days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest, as a viable ongoing business, the Divestiture Business, which includes Foseco's CBC plant in Saybrook, Ohio and related tangible and intangible assets.[1] The assets must be divested in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Business can and will be operated by the purchaser as a viable, ongoing business capable of competing effectively in the relevant markets. Defendants must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with prospective purchasers.

In the event that defendants do not accomplish the divestiture within the period prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestiture. If a trustee is appointed, the proposed Final Judgment provides that defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six

---

[1] The parties agreed to remedy the adverse effects in the markets for ladle shrouds and stopper rods by divesting the entire U.S. CBC business, including the Saybrook facility where Foseco manufactures all of the CBCs it sells in the United States. The proposed remedy would enable the purchaser to offer the "full line" of CBCs currently being sold by Foseco – including, for instance, subentry nozzles and subentry shrouds – which would ensure that the purchaser would have the incentive and all the assets necessary to be an effective, long-term competitor in these products.

months, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

Selected Provisions of the Proposed Final Judgment

Section IV(H) of the proposed Final Judgment requires defendants to sell the Divestiture Business – Foseco's CBC business in the United States – to the acquirer of Foseco's European CBC business, which includes assets in Bonnybridge, Stirlingshire, Scotland (the "Bonnybridge Business"). This requirement is warranted because the European Commission is requiring defendants to divest the Bonnybridge Business, and because of the practical difficulties of splitting between two acquirers rights to certain intellectual property and know-how used by both businesses.

Because the United States and the European Commission both must approve the same acquirer, Section IV(A) of the proposed Final Judgment provides that the United States will consult with the European Commission in exercising its review of defendants' sale of the Divestiture Business in a manner consistent with the proposed Final Judgment, to an acquirer acceptable to the United States in its sole discretion. As noted above, if the defendants do not divest the Divestiture Business within the required time period, the Court, upon application of the United States, is to appoint a trustee to complete the divestiture. Because the European Commission also requires selection of a trustee if the divestiture is not completed within a certain time, Section V(A) of the proposed Final Judgment provides that the United States shall select a trustee after consultation with the European Commission to ensure selection of a trustee acceptable to both the United States and the European Commission.

9

The divestiture provisions of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the manufacture and sale of ladle shrouds and stopper rods in the United States.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this

Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

Maribeth Petrizzi
Chief, Litigation II Section
Antitrust Division
United States Department of Justice
1401 H St. N.W., Suite 3000
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Cookson's acquisition of Foseco. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the provision of ladle shrouds and stopper rods in the United States. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

**VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT**

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[2]

---

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see*

---

[3] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

*also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not

pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[4]

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated:  March 4, 2008

Respectfully submitted,

Leslie Peritz
Helena Gardner
Attorneys
United States Department of Justice
Antitrust Division
Litigation II
1401 H Street, NW, Suite 3000
Washington, D.C. 20530
(202) 307-0924

16

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: |
| Plaintiff, | JUDGE: |
| v. | DECK TYPE:  Antitrust |
| COOKSON GROUP PLC,<br>COOKSON AMERICA INC.,<br>FOSECO PLC, and<br>FOSECO METALLURGICAL INC., | DATE STAMP: |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Leslie D. Peritz, hereby certify that on March 4, 2008, I caused a copy of the foregoing Competitive Impact Statement to be served upon defendants COOKSON GROUP PLC and COOKSON AMERICA INC. and FOSECO PLC and FOSECO METALLURGICAL INC., by mailing the document electronically to the duly authorized legal representatives of defendants as follows:

Counsel for COOKSON GROUP PLC
and COOKSON AMERICA INC.:

Thomas A. McGrath, Esquire
Linklaters LLP
1345 Avenue of the Americas
New York, New York 10105
(212)903-9140

Counsel for FOSECO PLC
and FOSECO METALLURGICAL INC:

Anthony Swisher, Esquire
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
(202 887-4263

Leslie D. Peritz
PA Bar No. 87539
Attorney
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 3000
Washington, D.C.  20530
(202) 307-0924

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: |
| Plaintiff, | JUDGE: |
| v. | DECK TYPE: Antitrust |
| COOKSON GROUP PLC, COOKSON AMERICA INC., FOSECO PLC, and FOSECO METALLURGICAL INC., | DATE STAMP: |
| Defendants. |  |

## PLAINTIFF UNITED STATES'
## EXPLANATION OF CONSENT DECREE PROCEDURES

Plaintiff United States of America ("United States") submits this short memorandum summarizing the procedures regarding the Court's entry of the proposed Final Judgment. This Judgment would settle this case pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)-(h) (the "APPA"), which applies to civil antitrust cases brought and settled by the United States.

1.      Today, the United States has filed a Complaint, Hold Separate Stipulation and Order, proposed Final Judgment, and Competitive Impact Statement. The parties have agreed that the Court may enter the proposed Final Judgment following compliance with the APPA.

2.      The APPA requires that the United States publish the proposed Final Judgment and Competitive Impact Statement in the *Federal Register* and in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment. The notice will inform members

1

of the public that they may submit comments about the proposed Final Judgment to the United

States Department of Justice, Antitrust Division (*see* 15 U.S.C. §§ 16(b)-(c)).

      3.        During the sixty-day period, the United States will consider, and at the close of

that period respond to, any comments that it has received, and it will publish the comments and

the United States' responses in the *Federal Register*.

      4.        After the expiration of the sixty-day period, the United States will file with the

Court the comments and the United States' responses, and it may ask the Court to enter the

proposed Final Judgment (unless the United States has decided to withdraw its consent to entry

of the Final Judgment, as permitted by paragraph IV(A) of the Hold Separate Stipulation and

Order, *see* 15 U.S.C. § 16(d)).

      5.        If the United States requests that the Court enter the proposed Final Judgment

after compliance with the APPA, 15 U.S.C. §§ 16(e)-(f), then the Court may enter the Final

Judgment without a hearing, provided that it concludes that the Final Judgment is in the public interest.

Dated:  March 4 2008

Respectfully submitted,

PLAINTIFF UNITED STATES OF AMERICA:

Leslie Peritz
Helena Gardner
Attorneys
U.S. Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W.
Suite 3000
Washington, D.C.  20530
Tel:  (202) 307-0924)

3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: |
| Plaintiff, | JUDGE: |
| v. | DECK TYPE:  Antitrust |
| COOKSON GROUP PLC,<br>COOKSON AMERICA INC.,<br>FOSECO PLC, and<br>FOSECO METALLURGICAL INC., | DATE STAMP: |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Leslie D. Peritz, hereby certify that on March 4, 2008, I caused a copy of the foregoing Explanation of Consent Decree Procedures to be served upon defendants COOKSON GROUP PLC and COOKSON AMERICA INC. and FOSECO PLC and FOSECO METALLURGICAL INC., by mailing the document electronically to the duly authorized legal representatives of defendants as follows:

Counsel for COOKSON GROUP PLC
and COOKSON AMERICA INC.:

Thomas A. McGrath, Esquire
Linklaters LLP
1345 Avenue of the Americas
New York, New York 10105
(212)903-9140

Counsel for FOSECO PLC
and FOSECO METALLURGICAL INC:

Anthony Swisher, Esquire
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
(202 887-4263

Leslie D. Peritz
PA Bar No. 87539
Attorney
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 3000
Washington, D.C.  20530
(202) 307-0924